# GEORGE OREY et al., Petitioners, v. ROY E. MOLLER et al., Respondents.

### St. Louis Court of Appeals, October 11, 1909.

1. **HABEAS CORPUS: Res Judicata.** A decision of the circuit court in a habeas corpus proceeding for the custody of a child, adverse to the petitioner, cannot be taken as *res judicata* of his right, in a like proceeding in this court.

2. ————: **Custody of Children: Rules of Decision.** In controversies over children, their own welfare is the main consideration of the courts in determining the question of custody. Nevertheless, the father has the first claim, unless he is unworthy to have the care and maintenance of the child, has abandoned it, is unable to care for it, or some other strong reason obtains for denying him the right.

3. ————: ————: ————: **Adoptive Parents.** The mere fact that adoptive parents are better off financially than the natural parents ought not to be regarded as a controlling circumstance, otherwise poor parents might be denied the rearing of their children.

4. ————: ————: ————: ————: **Parents' Consent.** In a habeas corpus proceeding, instituted by a father against the adoptive parents of his daughter for the recovery of the latter, a letter introduced in evidence written by the father to his wife, the child's mother, told her "to hold onto the child as long as possible." *Held*, this remark implied she might make some temporary arrangement for the care of the child, but cannot be reasoned as a consent to the relinquishment of it altogether.

5. ————: ————: ————: ————: **Case Stated.** A father left his wife in Indiana prior to the birth of the child in controversy, with the wife's consent, to obtain work in Montana. During his stay there he refused to consent to his wife's parting with the child. The mother placed the child in the custody of a children's society, from which it was adopted by defendants. The father afterwards returned to his family, and it appears did the best he could all along for his wife and children, and he is now with them, earning a living wage. *Held*, he is entitled to the child's custody.

## Habeas Corpus.

WRIT AWARDED.

*Alroy S. Phillips* for petitioner.

(1)    Where the facts stated in the return are denied, the testimony of respondent comes first in the order of proof, but the petitioners have the right to open and close the argument.  9 Encyc. Pl. and Pr., 1052; secs. 3572 and 3574, R. S. 1899; In re Durbin, 102 Mo. 100; In re Moyer, 35 Colo. 159; Weir v. Marley, 99 Mo. 484; 15 Encyc. Pl. and Pr., 182; Church on Habeas Corpus (2 Ed.), sec. 164, p. 246.    (2)    Because the appellate courts of this State have no appellate jurisdiction in a proceeding by habeas corpus, either by appeal, writ of error or certiorari, a plea of *res adjudicata* is estopped by record arising out of a judgment of a circuit court remanding an infant is no defense to such proceeding in this court.  R. S. 1899, sec. 3546; Ferguson v. Ferguson, 36 Mo. 197; Ex parte Jilz, 64 Mo. 205; Weir v. Marley, 99 Mo. 484; State ex rel. Hiett v. Simmons, 112 Mo. App. 535; State ex rel. Walker v. Dobson, 135 Mo. 1; In re Clark, 208 Mo. 121.    (3) The deed of release from the mother to the society is void as to both father and mother and conferred no rights upon the society to execute the deed of adoption. R. S. 1899, sec. 3541; Burns v. Burns, 132 Fed. 485; Sarazin v. Railroad, 153 Mo. 479; Tyler v. Reynolds, 53 Iowa 146.    (4)    The deed of adoption does not have the effect of depriving the parents of the right to the custody and control of their child.    R. S. 1899 as amended by the Laws of 1909, sec. 5246, p. 134; R. S. 1899, sec. 5248; R. S. 1899, as amended by the Laws of 1909, sec. 5251a, p. 134; In re Charles B. Clements, 78 Mo. 352; Hockaday v. Lynn, 200 Mo. 456; Burns v. Burns, 132 Fed. 485; Sarazin v. Railroad, 153 Mo. 479; Tyler v. Reynolds, 53 Iowa 146; R. S. 1899, sec. 5250. (5)    The best interest of the child demands that it be taken from the custody of respondents and given to the

custody of its parents. Weir v. Marley, 99 Mo. 484; Monk v. McDaniel, 116 Ga. 103; Miller v. Wallace, 76 Ga. 479; Ex parte Davidge, 72 S. C. 16; Mahon v. The People, 218 Ill. 171; Dunkin v. Seifert, 123 Iowa 64; Watts v. Lively, 60 S. W. (Tex. Civ. App.) 676; Carter v. Botts, 93 P. (Kan.) 584; In re Neff, 20 Wash. 652; In re Delano, 37 Mo. App. 185; R. S. 1899, sec. 3494; In re Doyle, 16 Mo. App. 159.

*W. A. Coley* and *Robt. A. Swink* for respondent.

GOODE, J.—The petitioner, George Orey, seeks by a writ of habeas corpus issued from this court to obtain the custody of his daughter Georgia, a child born October 2, 1908, and hence a few days over a year old. On May 5, 1909, Mary Orey, mother of the child and wife of the petitioner, placed the child in the Children's Home Society of Missouri, a corporation chartered under the laws of the State, with power, under certain circumstances, to receive from parents the release of their parental rights over children. [R. S. 1899, chapter 35.] Afterwards the child was placed by the Children's Home Society in the family of Roy E. Moller, said family consisting of Roy E. Moller and his wife, who resided at Maplewood, in St. Louis county. Those persons and the Children's Home Society executed a deed of adoption of the child on July 13, 1909, but the deed was not recorded in the office of the recorder of deeds of the county until August 24, 1909, which was after the institution of a prior proceeding by the petitioner before the judge of the circuit court of St. Louis county to recover the child. The circumstances leading up to the child being put in the Children's Home by its mother were these: The petitioners, George Orey and his wife, married in Vincennes, Indiana, and lived there until September, 1908, at which time they had four children. He is a man thirty years old and she a woman somewhat younger. Orey had an uncle living

in Butte, Montana, who desired him to come out there to live. Orey is by trade a plumber and as he understood plumbers received higher wages in Montana than in Indiana, he desired to go. At that time the birth of the child in controversy was expected to occur inside a month, and a physician had been engaged to attend the mother during confinement. However, she coincided with her husband in his view that it was best for him to go west and he went with her approval and consent. They owned an equity in a home in Vincennes which he sold, turned over $50 of the money to his wife and retained the remainder, $90, to pay his expenses to Butte and to live on there until he could get work. He expected to remit money for expenses to his wife as soon as he began to draw wages. When he got to Butte he found he could not get work unless he became a member of a Plumbers' Association and that for some reason the association would not admit him to membership. Hence he worked at several jobs to earn a living for himself and family. He got employment on a ranch, as a bridge carpenter on a railroad, then as a common laborer, and again as a bridge carpenter. Between September and Christmas he sent his wife money three times, in all sixty dollars. Meanwhile she had moved to St. Louis to be with her mother, bringing with her one child and leaving the others in an Orphans' Home in Vincennes. She lived in St. Louis with her mother, giving birth, as stated, to the child in controversy, in October. When she was strong enough, Mrs. Orey sought employment to help maintain herself and children, and was taken into the service of the St. Louis House and Window Cleaning Company. She worked hard, getting up at three or four o'clock in the morning to do scrubbing in a restaurant. Her husband wrote to her and she to him fortnightly, but he did not send her any money during March, April and the forepart of May. He explained this as due to the fact he was working for a railroad company and could not draw his

wages under the company's arrangement for paying their employees. Mrs. Orey felt unable to look after the baby on account of the work she was doing, and for this reason placed it in the Home. She wrote to her husband she was thinking of doing so, and he objected, telling her to hold on to it as long as possible. When she wrote him she had put it in the Home, he said he was coming back soon and would reclaim it. Orey saved his money and in the summer returned with some $200. He at once set about getting his daughter from the Home, but the manager would not tell him where it was. He ascertained it had been put in the family of Mr. and Mrs. Moller and demanded it of them, but they refused to relinquish it. He then instituted a proceeding to recover it by habeas corpus, but the first application was determined against him in the circuit court of St. Louis county, and he then instituted the present proceeding in this court. The evidence shows without controversy that Orey is a steady and indus-trious man and of good moral character. The Mollers appear to be excellent people and in good financial con-dition; they have become attached to the child and de-sire to retain it; whereas Orey and his wife, from the natural affection of parents, desire to recover it in order to bring it up with its brothers and sisters, enjoy its companionship and rear it according to their religion, they being Catholics and the Mollers Protestants.

The decision of the learned circuit judge, adversely to the petitioner, cannot be taken as res judicata of his right. [Wier v. Marley, 99 Mo. 484.] Brushing aside all technical grounds, like the omission to record the deed of adoption until the institution of the first pro-ceeding by habeas corpus, and the further question as to whether the deed by the mother was so drawn and under such circumstances as to bind anybody, we go to the merits of the case as between the petitioner, the father of the child, and the respondents. It is true in controversies over the custody of children, their own

welfare is the main consideration of the courts in determining the question of custody.  Nevertheless, the father, as the natural parent, has the first claim unless he is unworthy to have the care and maintenance of his child, has abandoned it, is unable to take care of it, or there is some other strong reason for denying him the right.  [Wier v. Marley, supra.]  The mere fact that the adoptive parents are better off financially than he, ought not to be regarded as a controlling circumstance, or poor parents might be denied the rearing of their children.  [Ex parte Davidge, 72 S. C. 16; Miller v. Wallace, 78 Ga. 479.]  It is plain in the present case that Orey had in no way relinquished his rights as a parent.  He never signed a deed releasing them, or consenting to the adoption of the child, and, indeed, protested even against his wife's putting it in a Home.  It is true in one of his letters he told her "to hold on to it as long as possible," and it is argued this was an implied consent to her surrendering the custody of it when it became impossible for her to support it.  The remark implied she might make some temporary arrangement for the care of the child, but cannot be reasoned into consenting to relinquish it altogether, or that it might be adopted by some one else to the exclusion of his right to reclaim it when able to do so.  Nothing had been intimated to him concerning such a course.  His character has been proved good, all the evidence going to show he is a hard-working economical man and inclined to use his wages to provide for his family.  The fact that he left his wife shortly before their child was expected to be born and went west hunting employment, though much dwelt on as prejudicial, is not so, since he took this course with her judgment and approval in the hope of bettering the lot of the family.  Such vicissitudes are liable to occur in the life of any family, particularly in that of a poor one.  It appears Orey did the best he could all along for his wife and children, is now with

them earning a living wage in St. Louis and we think his right is clear to have his daughter turned over to him. All concur.